Citation Nr: 1518717 
Decision Date: 04/30/15 Archive Date: 05/05/15

DOCKET NO. 10-27 781 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Petersburg, Florida


THE ISSUE

Entitlement to a disability rating in excess of 30 percent for posttraumatic stress disorder (PTSD) prior to December 13, 2013, and to a disability rating in excess of 50 percent thereafter.


REPRESENTATION

Veteran represented by: Florida Department of Veterans Affairs


WITNESSES AT HEARING ON APPEAL

The Veteran and his former spouse


ATTORNEY FOR THE BOARD

D. Martz Ames, Counsel


INTRODUCTION

The Veteran had active service from March 1964 to March 1967.

This matter comes before the Board of Veterans' Appeals (Board) on appeal from an August 2009 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in St. Petersburg, Florida. 

In an April 2014 rating decision, the Appeals Management Center (AMC) increased the Veteran's disability rating for PTSD from 30 percent to 50 percent, effective December 13, 2013. When a veteran seeks an increased evaluation, it will generally be presumed that the maximum benefit allowed by law and regulation is sought, and it follows that such a claim remains in controversy where less than the maximum benefit available is awarded. See AB v. Brown, 6 Vet. App. 35 (1993). 

The Veteran and his former spouse testified at a hearing in April 2013 before the undersigned. A copy of the transcript is of record. 

In November 2013 and July 2014, the Board remanded this case to the RO via the AMC for further development and it has now been returned to the Board. 

This appeal was processed using the Veterans Benefits Management System (VBMS). 


FINDING OF FACT

For the entire appeal period, the Veteran's PTSD produced occupational and social impairment with reduced reliability and productivity. 


CONCLUSION OF LAW

The criteria for a 50 percent disability rating for PTSD, but no higher, have been approximated for the entire appeal period. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.321, 4.1-4.14, 4.125, 4.130, Diagnostic Code 9411 (2014).


REASONS AND BASES FOR FINDING AND CONCLUSION

I. Duty to Notify and Assist

VA has met all statutory and regulatory notice and duty to assist provisions set forth in the Veterans Claims Assistance Act of 2000 (VCAA). 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.326(a) (2014). Prior to initial adjudication, a letter dated in July 2009 satisfied the duty to notify provisions with regard to the Veteran's increased rating claim. With regard to the duty to assist, the Veteran's service treatment records, VA medical treatment records, and indicated private medical records have been obtained. VA examinations adequate for adjudication purposes were provided to the Veteran in connection with his claim in August 2009 and December 2013. See McLendon v. Nicholson, 20 Vet. App. 79 (2006); Barr v. Nicholson, 21 Vet. App. 303, 311 (2007). The examinations are adequate because they were based upon consideration of the Veteran's pertinent medical history, his lay assertions and complaints, and because they describe his PTSD in detail sufficient to allow the Board to make a fully informed determination. See Ardison v. Brown, 6 Vet. App. 405, 407 (1994).

The Veteran and his former spouse testified at a hearing before the undersigned in April 2013. The hearing focused on the elements necessary to substantiate his increased rating claim and, through his testimony and his representative's statements, the Veteran demonstrated that he had actual knowledge of the elements necessary to substantiate his claim. See Bryant v. Shinseki, 23 Vet. App. 488 (2010); see also Procopio v. Shinseki, 26 Vet. App 76 (2012). 

As there is no indication that any failure on the part of VA to provide additional notice or assistance reasonably affects the outcome of this case, the Board finds that any such failure is harmless. See Mayfield v. Nicholson, 20 Vet. App. 537 (2006); see also Shinseki v. Sanders, 556 U. S. 396, 129 S. Ct. 1696 (2009) (reversing prior case law imposing a presumption of prejudice on any notice deficiency, and clarifying that the burden of showing that an error is harmful, or prejudicial, normally falls upon the party attacking the agency's determination). Further, the purpose behind the notice requirement has been satisfied because the Veteran has been afforded a meaningful opportunity to participate effectively in the processing of his claims, to include the opportunity to present pertinent evidence. 

In November 2013, the Board remanded this case so additional VA treatment records could be obtained and the Veteran could be provided with a VA examination. In July 2014, the case was remanded so that the Veteran's Vet Center records could be obtained. These actions were accomplished. The Board notes that the RO sent the Veteran a letter in January 2015 indicating that his Vet Center records were unavailable. However, they were subsequently submitted by the Veteran and reviewed in the January 2015 Supplemental Statement of the Case. There was substantial compliance with the Board's remand directives. See Stegall v. West, 11 Vet. App. 268 (1998); Dyment v. West, 13 Vet. App. 141, 146-47 (1999). 

II. Increased Rating Claim 

Disability ratings are determined by applying the criteria established in VA's Schedule for Rating Disabilities, which is based upon the average impairment of earning capacity. Individual disabilities are assigned separate Diagnostic Codes. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. §§ 4.1, 4.20 (2014). When a question arises as to which of two ratings applies under a particular Diagnostic Code, the higher evaluation is assigned if the disability more nearly approximates the criteria for the higher rating; otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2014). Consideration must be given to increased evaluations under other potentially applicable Diagnostic Codes. Schafrath v. Derwinski, 1 Vet. App. 589, 595 (1991). Furthermore, when it is not possible to separate the effects of the service-connected disability from a non service-connected condition, such signs and symptoms must be attributed to the service-connected disability. 38 C.F.R. § 3.102 (2014); Mittleider v. West, 11 Vet. App. 181, 182 (1998) (per curiam). After careful consideration of the evidence, any reasonable doubt remaining is resolved in favor of the claimant. 38 C.F.R. § 4.3 (2014).

Staged ratings are appropriate for an increased rating claim when the factual findings show distinct time periods where the service-connected disability exhibits symptoms that would warrant different ratings. Hart v. Mansfield, 21 Vet. App. 505 (2007) (citing Fenderson v. West, 12 Vet. App. 119, 126 (1999)). Where entitlement to compensation already has been established and an increase in the disability rating is at issue, it is the present level of disability that is of primary concern. See Francisco v. Brown, 7 Vet. App. 55, 58 (1994). The Veteran's entire history is to be considered when making a disability determination. 38 C.F.R. § 4.1 (2014); Schafrath v. Derwinski, 1 Vet. App. 589 (1995). 

The evaluation of evidence generally involves a three-step inquiry. First, the Board must determine whether the evidence comes from a competent source. Second, the Board must determine if the evidence is credible. Barr v. Nicholson, 21 Vet. App. 303, 308 (2007). Third, the Board must weigh the probative value of the evidence in light of the entirety of the record. 

The standard of proof to be applied in decisions on claims for veterans' benefits is set forth in 38 U.S.C.A. § 5107 (West 2014). A claimant is entitled to the benefit of the doubt when there is an approximate balance of positive and negative evidence. See 38 C.F.R. § 3.102 (2014). When a claimant seeks benefits and the evidence is in relative equipoise, the claimant prevails. See Gilbert v. Derwinski, 1 Vet. App. 49 (1990). The preponderance of the evidence must be against the claim for benefits to be denied. See Alemany v. Brown, 9 Vet. App. 518 (1996).

The Veteran's PTSD was assigned a 30 percent disability rating under Diagnostic Code 9411. 38 C.F.R. § 4.130 (2014). In an April 2014 rating decision, the disability rating was increased to 50 percent, effective December 13, 2013. PTSD is evaluated under the General Rating Formula for Mental Disorders. 38 C.F.R. § 4.130 (2014). The diagnostic criteria set forth in The American Psychiatric Association: Diagnostic And Statistical Manual Of Mental Disorders, (4th ed. 1994) (DSM- IV) for mental disorders have been adopted by the VA. 38 C.F.R. § 4.125 (2013). 

Under the General Rating Formula for Mental Disorders, a 30 percent rating is warranted when there is occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events). 38 C.F.R. § 4.130 (2014). 

A 50 percent rating is assigned when there is occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; and difficulty in establishing and maintaining effective work and social relationships. Id. 

A 70 percent rating is assigned for occupational and social impairment with deficiencies in most areas, such as work, school, family relationships, judgment, thinking or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); and inability to establish and maintain effective relationships. Id. 

Symptoms listed in the General Rating Formula for Mental Disorders are not intended to constitute an exhaustive list, but rather are to serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular rating. Mauerhan v. Principi, 16 Vet. App. 436 (2002). A veteran may only qualify for a given disability rating under § 4.130 by demonstrating the particular symptoms associated with that percentage, or others of similar severity, frequency, and duration. Vazquez-Claudio v. Shinseki, 713 F.3d 112, 117 (Fed. Cir. 2013). Additionally, while symptomatology should be the primary focus when deciding entitlement to a given disability rating, § 4.130 requires not only the presence of certain symptoms but also that those symptoms have caused the requisite occupational and social impairment. Id.

The DSM-IV contains a Global Assessment of Functioning (GAF) scale, with scores ranging between zero and 100 percent, representing the psychological, social, and occupational functioning of an individual on a hypothetical continuum of mental health-illness. Higher scores correspond to better functioning of the individual. During the appeal period, the Veteran's GAF scores ranged from 49 at worst, to 60 at best. 

GAF scores ranging between 41 and 50 are assigned when there are serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

GAF scores ranging between 51 and 60 are assigned when there are moderate symptoms (like flat affect and circumstantial speech, and occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). 

It is important to note that a GAF score is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Richard v. Brown, 9 Vet. App. 266, 267 (1996) (citing DSM-IV at 32). A GAF score is highly probative because it relates directly to the Veteran's level of impairment and social and industrial adaptability. Massey v. Brown, 7 Vet. App. 204, 207 (1994). Although GAF scores are important in evaluating mental disorders, the Board must consider all the pertinent evidence of record and set forth a decision based on the totality of the evidence. See Carpenter v. Brown, 8 Vet. App. 240, 242 (1995).

After carefully reviewing the evidence of record, the Board concludes that the Veteran's PTSD symptoms more closely approximate a 50 percent rating for the entire appeal period. Specifically, they are of the frequency, severity and duration such that they cause occupational and social impairment with reduced reliability and productivity. 38 C.F.R. § 4.130 (2014). However, for the reasons discussed below, his PTSD symptoms are not more closely approximated by the 70 percent criteria, which contemplate occupational and social impairment with deficiencies in most areas, such as work, school, family relationships, judgment, thinking or mood. Id. 

In August 2009, the Veteran underwent a VA examination. He reported daily depression of moderate severity. He had eight hours of sleep per night with the assistance of medication, but it was interrupted. He stated that he had low energy and low self-esteem. He stated that he "...can still concentrate, I guess," and his memory was normal. He reported that he had been married to his third wife for 10 or 15 years and that his relationship was "...not too good...," however he described his relationship with his four children as close. He had a "couple" of friends and enjoyed boating. He reported recurring nightmares, avoidance of circumstances that reminded him of his stressors, a sense of foreshortened future, hypervigilance, exaggerated startle response, and outbursts of irritably or anger. The examiner concluded that the Veteran's intrusive memories, nightmares, avoidance, and physical reaction to cues of trauma occurred at least once a week and were chronic, but were all of mild severity. The examiner found that the Veteran had mild anger problems. He denied flashbacks, panic attacks, and episodes of violence. The examiner stated that the Veteran had "relatively mild social withdrawal." 

Upon examination, his psychomotor activity and thoughts were normal. His mood was "all right," and his affect was full. He did not have hallucinations or delusions. His judgment was normal and with regard to insight, he "partially" understood that he had a problem. He had an incomplete understanding of proverbs. His impulse control was "fair." His remote memory was normal but his recent and immediate memory were "mildly impaired." His GAF score was 60, indicating moderate symptoms. The examiner found that the Veteran's symptoms were transient or mild and decreased work efficiency and ability to perform occupational tasks only during periods of significant stress. This level of impairment corresponds to the criteria contemplated by the 10 percent rating criteria. 38 C.F.R. § 4.130 (2014). 

The Veteran underwent a second VA examination in December 2013. Like the August 2009 VA examiner, the December 2013 VA examiner found that the Veteran's symptoms were transient or mild and decreased work efficiency and ability to perform occupational tasks only during periods of significant stress, as described by the 10 percent criteria. The examiner explained, 

The results of this exam were not indicative of clear significant occupational or social impairment due to the mental disorders compared to premorbid functioning (e.g., Veteran reported having only one close friend prior to military. Veteran gave vague explanation for recent divorce. Veteran gave vague account of possible negative repercussions from alcohol use. Veteran reported that he has closed his 30 year business due to reduced income). 

The examiner noted that the Veteran had been divorced three times, most recently in 2013. The Veteran provided vague reasons for his divorces but stated that he currently lived with his most recent former spouse, who "look[ed] after him." The examiner noted that, "[h]e initially said that they moved in together becau[se] he was not taking care of himself. However, he then said, 'I was fine.'" The Veteran described his relationships with his wife and daughter as okay. He reported having one close friend. The examiner noted that the Veteran reported having only one close friend prior to his period of military service, indicating that this was not a result of his PTSD. The Veteran reported that he had been in two fights since August 2009 because he was struck by another person and retaliated. 

The Veteran reported nightmares three to four times per week. The examiner found that these were chronic and moderate in severity. He reported flashbacks, which the examiner described as "mild/below threshold." The examiner found that the Veteran displayed avoidance "most of the time," but that it was mild. The Veteran reported difficulty trusting people. He had "episodic" outbursts of irritability and the examiner noted that the he "snapped angrily at the undersigned when he didn't like the way a question[]... that was phrased that from the undersigned's perspective was not provocative." The Veteran did not feel safe in public and he described his exaggerated startle response as "episodic." He stated that his ability to concentrate was "not too awful good." He reported having anxiety and three to four hours of sleep per night. 

The Veteran reported that he felt depressed daily. He denied anhedonia and stated that he enjoyed spending time with his daughter, reading, fishing, and boating. The examiner noted that the Veteran was capable of having loving feelings for his daughter. He denied suicidal and homicidal ideation. The examiner stated that there was no evidence of remote or immediate memory loss. However, the Veteran was one day off when asked to recall the date. The examiner concluded that the Veteran did not have any other PTSD symptoms aside from those discussed at the examination. 

The Veteran receives regular PTSD treatment. In October 2008, he reported that his symptoms were recurrent but not as frequent. He stated that his anger issues had not been a problem recently. In December 2008, he reported that he was doing "fair," and that his symptoms waxed and waned. He stated that he had depression but that it was not predominant. He described his home situation as "good," and stated that he tried to stay busy. 

In March 2009, he was doing "fair," but found the holidays difficult because of fireworks. He was also distressed by hearing helicopters during a missing person search near his home. He stated that this incident resulted in an increase in symptoms and his therapist noted that, "to this date has experienced an increase in PTSD nightmares, intrusive thoughts, racing thoughts have continued, depression not predominant but has been more pronounced." Also in March 2009, the Veteran complained of depression, anxiety, decreased ability to concentrate, memory problems, insomnia, social aversion and isolation, poor anger control with verbal outbursts, low self-esteem, nightmares, intrusive thoughts, flashbacks, exaggerated startle response, and hypervigilance. He denied suicidal and homicidal ideation. He stated that he remained in close contact with his adult children, especially his second son. He had one close friend. He reported a history of bar room fights and noted that he had been arrested in the past, but did not specify a date. Upon examination, his speech and thoughts were normal. His mood was "mildly" dysthymic with periods of anxiety. His GAF score was 56, indicating moderate symptoms. Also in March 2009, the Veteran again reported many of the above-described symptoms. He stated that he got along with his spouse's family and "they often socialize together." He had one close friend who he "visits every so often." Upon examination his speech and motor behavior were normal. His mood was mildly dysthymic and he had periods of anxiety. His perception was normal, but past flashbacks were noted. His GAF score was 56. 

In April 2009, he reported that he was doing "fair" and that his sleep was "improved," and that he had decreased nightmares and intrusive thoughts. It was noted that his depression "fluctuates." 

In July 2009, he presented with neutral mood and congruent affect, but his affect became more intense when discussing his stressors. The Veteran had subjective complaints of memory problems, but his memory was normal when tested. He stated that his symptoms waxed and waned. He denied suicidal and homicidal ideation. He stated that he was uncomfortable with the level of anger he felt at having to wait a long time for his appointment. He stated that he like to go out on his boat for comfort. He described his sleep as problematic but stated that his nightmares were "under control." 

In August 2009, he stated that his symptoms waxed and waned but were "not as disturbing as in [the] past." However, in December 2009, he reported an increase in depression. 

In February 2010, his GAF score was 50, indicating serious symptoms. It was noted that he had chronic intrusive thoughts. In March 2010, his startle response was objectively observable. He presented as anxious and endorsed ideas about how he could "set up" an accident like "being struck by lightning," but that he needed to be present for his daughter. It was noted that he had risk factors for suicide but that his daughter prevented him from doing so. He reported seeing shadows at night and having flashbacks when reminded of his stressor. He was "chronically" dysphoric and angry. He avoided people and enjoyed fishing and crabbing because they are solitary activities. He reported "some days" when he did not have depression and that his last panic attack was "a couple of years ago." He felt that his anger was well controlled and that he would not act on it unless he or his family were threatened. He had daily intrusive thoughts and nightly nightmares. It was noted that his flashbacks occurred in groups. 

In September 2010, he had no acute affective symptoms or suicidal or homicidal ideation. He reported intrusive thoughts. Upon examination, his speech, thoughts, memory, mood, and affect were all normal. His judgment and insight were intact. His GAF score was 50, indicating serious symptoms. 

In January 2011, he noted that he took sleep medication once per week. He stated that he was trying to simplify his life. He had subjective complaints of mild memory problems, but his memory was normal when tested. Upon examination, his speech, thoughts, memory, mood, and affect were all normal. His judgment and insight were intact. His GAF score was again 50, indicating serious symptoms. 

In April 2011, he was noted to be "chronically" dysphoric and anxious," and he had problems with anger and memory. His GAF score was 49, the lowest during the appeal period. In June 2011, he reported baseline functioning on his medications and he had no acute affective symptoms. He continued to have intrusive thoughts and nightmares. He had "good insight into his anger," and worked to control distorted thinking with internal redirection. He enjoyed spending time alone. Upon examination his speech, concentration, memory, and perception was normal. His mood was euthymic, angry, and anxious. His affect was congruent. 

In May 2012, he presented as tense but socially pleasant. His memory appeared intact. He was in the process of divorcing his spouse. He felt close to his youngest daughter. He stated that he enjoyed crabbing, but had no close friends. He stated that he had nightmares but they were "less intense" with medication. He slept six to eight hours per night. In June 2012, he stated that he was considering living with his former spouse in order to be closer to their daughter. He stated that he regretted being less involved with his three now-adult children but now he was "quite involved" with them via regular telephone and in person contact. Later in June 2012, "[h]e reported he was doing as well as could be and had no psychosocial concerns." 

In July 2012, he reported an increase of PTSD symptoms as a result of fourth of July fireworks, helicopters spraying near his home, and the death of a neighbor. He stated that his intrusive memories and sleep problems had increased. 

In August 2012, he reported intrusive thoughts, guilt, exaggerated startle response, isolation, depressed mood, irritability, and "occasional" explosiveness. In September 2012, he stated that he was less emotional than before, and that he still had irritability but its severity had "decreased." He went crabbing for recreation. In October 2012, it was noted that he had depression but that it was "...not the predominant mood." His nightmares and intrusive thoughts were "not as prominent with treatment." 

In March 2013, he reported that his depression waxed and waned, but that his mood was primarily dysphoric. It was noted that his depression was both frequent and chronic, but was not severe enough to interfere with his activities of daily living (ADLs). He was noted that he had fluctuating self-esteem and that at times he had anhedonia which was "more prominent." He reported nightmares, intrusive thoughts, exaggerated startle response, feelings of isolation, and few if any friends. His mood was dysphoric and his GAF score was 50. 

The record also contains lay evidence that provides information about the Veteran's PTSD symptoms. In his August 2009 Notice of Disagreement, he stated that he frequently forgot how to get to places he had been to before. He described his relationships as okay but noted that he avoided being at home. In his June 2010 VA Form 9, he stated that he felt VA was penalizing him for having relationships with his children and that he did not socialize or do activities with them. Instead, he spoke on the phone with them. 

In April 2012, his adult son, R. S., submitted a letter describing the Veteran's symptoms. He did not provide a time frame for when these symptoms were present, so it is not possible to determine whether they have been present during the appeal period. R. S. described his childhood, which did not occur during the appeal period. However, he also stated that during his adult life, the Veteran saw "charley" in the trees at night sometimes and would become tearful when discussing his stressors. R. S. described the Veteran's stressors and stated that he had "serious issues with his war time experiences." 

At his April 2013 hearing, the Veteran stated that he had memory problems. His former spouse stated that one of his sons gave him an ultimatum to seek help for his symptoms because "back then he was bad." She stated that she and the Veteran were no longer married was "...because of the panic attacks that he has, mainly at night." She explained that he woke up "swinging" if touched and that this placed their young daughter in danger. Therefore, she was not allowed in their bedroom when the Veteran was asleep. His former spouse stated that he crabbed for employment because it was a solitary activity. She stated that he only had a close relationship with his youngest adult son and his seven year old daughter. She stated that he spoke to his adult daughter on the telephone "every once in a while" and had no relationship with his oldest son. 

The Board finds the lay evidence of record, including the Veteran's hearing testimony, to be both competent and credible. Layno v. Brown, 6 Vet. App. 465 (1994); Barr v. Nicholson, 21 Vet. App. 303, 308 (2007). 

After interpreting the evidence in the most favorable light, the Board finds that the Veteran's PTSD has produced occupational and social impairment with reduced reliability and productivity for the entire appeal period. 38 C.F.R. § 4.130 (2014). The Veteran's disability picture is more closely approximated by the 50 percent criteria. 38 C.F.R. §§ 4.3, 4.7 (2014). To this extent, the appeal is granted. 

However, the Board finds that the frequency, severity, and duration of the Veteran's PTSD symptoms do not rise to the level such that they are more accurately described by the 70 percent criteria. Specifically, the Board finds that they do not cause occupational and social impairment with deficiencies in most areas, such as work, school, family relationships, judgment, thinking or mood. See 38 C.F.R. § 4.130 (2014). 

While the Veteran has anger issues and irritability with verbal outbursts, there was no evidence that he had impaired impulse control with periods of unprovoked violence. At his December 2013 VA examination, he discussed being in two bar room fights since his August 2009 VA examination. However, he asserted that these occurred because he was struck by another person and he retaliated. Therefore, these altercations were not unprovoked. Further, during the appeal period, which covers many years, he has only admitted to two physical altercations, which does not rise to the level of frequency needed to be more closely described by the 70 percent criteria. 

There was no evidence of obsessional rituals, neglect of appearance, or disorientation of any kind. There was no evidence of impairment of thought, communication, or speech. The Veteran did not have delusions or hallucinations. Notably, the August 2009 VA examiner described his nightmares, intrusive memories, avoidance behaviors, and anger problems as "mild." Additionally, both the August 2009 and December 2013 VA examiners found that the Veteran's PTSD produced only occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, which is contemplated by the 10 percent criteria. Id. 

The record shows that the Veteran experiences chronic depression and anxiety. However, there is no evidence of record to show that it has ever interfered with his ability to function independently. The record does not show that his PTSD impacts his ADLs. Therefore, his depression and anxiety are not severe enough to be more accurately described by the 70 percent criteria. 

The Veteran has consistently had subjective complaints of memory loss, and occasionally reported problems concentrating. The Board notes that there is some question as to whether the Veteran's memory problems are the result of "early alcohol dementia," as noted in an April 2011 VA treatment record. However, because a VA examiner has stated that it is not possible to determine which of the Veteran's symptoms are a result of PTSD versus alcohol abuse, the Board will treat his memory symptoms as if they were part of his service-connected PTSD. See Mittleider, 11 Vet. App. at 182. However, his health care providers have found his level of impairment to be mild, and often found his memory to be normal upon objective testing. The frequency, duration, and level of severity are not more closely described by the 70 percent criteria. 

With regard to social and occupational impairment, there was no evidence that the Veteran had social impairment that produced an inability to establish and maintain effective relationships. Rather, his PTSD symptoms caused difficulty with interpersonal relationships. Specifically, he described his relationship with his children as good, even though his former spouse testified that the Veteran did not have positive relationships with some of his adult children. The Veteran stated that he had been married and divorced three times, but he continued to live with his former spouse so that he could spend time with his youngest daughter. As discussed above, his mental health care provider found that the Veteran was capable of having loving feelings for his daughter. Although the Veteran clearly has difficulty with interpersonal relationships, he is able to form and maintain them to some degree, and this is more closely described by the 50 percent criteria. 

Additionally, the Board notes that for most of the appeal period, the Veteran worked as a crabber or fisherman with his own boat, at least in part so that he could be away from people. This shows that his PTSD produced some level of occupational impairment because it impacted the career he chose. However, the record shows that he was able to work as a commercial crabber and fisherman for 30 years prior to closing his business due to insufficient funds, as opposed to because of his symptoms. Therefore, his level of occupational impairment is described more accurately by reduced reliability and productivity, which is contemplated by the 50 percent criteria. 

The Board notes that the medical records consistently show that the Veteran denied suicidal ideation, with the exception of March 2010, where he endorsed ideation of how he could "set up" an accident such as "being struck by lightning," but that he needed to be present for his youngest daughter. The medical evidence of record shows that his risk was suicide was low, and that he more consistently denied suicidal ideation. However, in his August 2009 Notice of Disagreement, he stated that he had suicidal ideation, but was reluctant to discuss it with his physician because he did not want to be "locked up." In his June 2010 VA Form 9, he stated that he had suicidal ideation but refused to reported it because he did not want to be "locked in the hospital." The Board notes that suicidal ideation is contemplated by the 70 percent criteria. However, the medical and lay evidence of record does not show that the Veteran's suicidal ideation is of a frequency, severity, or duration that it causes deficiencies in any areas of his life. Therefore, his credible assertions of unreported suicidal ideation do not cause his PTSD to be more closely described by the 70 percent criteria. 

Reviewing the evidence, the Board finds that the overall disability picture for the Veteran's PTSD does not more closely approximate a 70 percent rating under the applicable Diagnostic Code. 38 C.F.R. § 4.7 (2014). Therefore, the preponderance of the evidence is against this claim, and it must be denied. 38 C.F.R. § 4.3 (2014). In reaching this conclusion, the Board has considered the applicability of the benefit-of-the-doubt doctrine. However, that doctrine is not applicable where, as here, there is not an approximate balance of positive and negative evidence. See 38 U.S.C.A. § 5107(b) (West 2014); 38 C.F.R. § 3.102 (2014).

There is no evidence of exceptional or unusual circumstances to warrant remand to refer this claim for extraschedular consideration. 38 C.F.R. § 3.321(b)(1) (2014). The threshold factor for extraschedular consideration is a finding that the evidence presents such an exceptional disability picture that the available schedular evaluations for the service-connected disability at issue are inadequate. Therefore, there must be a comparison between the level of severity and the symptomatology of the Veteran's disability with the established criteria provided in the rating schedule for the disability. If the criteria reasonably describe the Veteran's disability level and symptomatology, then the disability picture is contemplated by the rating schedule, the assigned evaluation is adequate, and no referral to the Director of the Compensation Service for consideration of an extraschedular rating is required. Thun v. Peake, 22 Vet. App. 111 (2008), aff'd, Thun v. Shinseki, 572 F.3d 1366 (Fed. Cir. 2009).

As described above, the manifestations of the Veteran's PTSD are contemplated by the schedular criteria set forth in the General Rating Formula for Mental Disorders. The list of symptoms for each of the ratings in the formula is preceded by the words "such as," confirming that the listed symptoms are examples, as opposed to an exhaustive list. See 38 C.F.R. § 4.130 (2014); see also Mauerhan, 16 Vet. App. 436. The Board has determined whether the symptoms associated with his PTSD are of the kind enumerated in the regulation, but also whether the types of symptoms he experiences result in the level of occupational and social impairment specified by a rating. See Vazquez-Claudio, 713 F. 3d at 118). The criteria practicably represent the average impairment in earning capacity resulting from the Veteran's service-connected PTSD, such that he is adequately compensated for "considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability." See 38 C.F.R. § 4.1 (2014). Further, no examiner has reported an exceptional disability picture with symptoms not represented in the rating schedule. In sum, there is no indication that the average industrial impairment from the disability would be in excess of that contemplated by the assigned rating. Accordingly, the Board has determined that remand for referral of this case for extraschedular consideration is not in order. 

The Board also notes that under Johnson v. McDonald, 762 F. 3d 1362 (Fed. Cir. 2014), a Veteran may be awarded an extraschedular rating based upon the combined effect of multiple conditions in an exceptional circumstance where the evaluation of the individual conditions fails to capture all the service-connected symptoms experienced. However, in this case, after applying the benefit of the doubt under Mittleider v. West, 11 Vet. App. 181 (1998), there are no additional service-connected symptoms that have not been attributed to a specific service-connected condition. Accordingly, this is not an exceptional circumstance in which extraschedular consideration may be required to compensate the Veteran for a disability that can be attributed only to the combined effect of multiple service-connected conditions. 

Finally, when entitlement to a total disability rating based on individual unemployability (TDIU) under the provisions of 38 C.F.R. § 4.16 is raised during the adjudicatory process of evaluating the underlying disabilities, it is part of the claim for benefits for the underlying disabilities. Rice v. Shinseki, 22 Vet. App. 447, 453-54 (2009). A TDIU claim is considered reasonably raised when a veteran submits medical evidence of a disability, makes a claim for the highest rating possible, and submits evidence of service-connected unemployability. See Roberson v. Principi, 251 F.3d 1378, 1384 (Fed. Cir. 2001).

In this case, the Veteran worked as a commercial crabber and fisherman until approximately three or four months prior to his December 2013 VA examination. The examiner stated that he closed it "because he was losing money," as opposed to because of his PTSD symptoms. The Board notes that the Veteran's former spouse testified that the Veteran chose to become a crabber so that he could work away from people, and that, at the time of the hearing, he worked two to three days per week with insufficient income. However, she did not attribute the failure of his business to PTSD. Instead, she asserted that the Veteran went on his boat to "just play[]." The evidence does not show that the Veteran's PTSD has caused unemployability, nor has the Veteran so asserted. Because there is no evidence of unemployability, further consideration of entitlement to TDIU is not required. Jackson v. Shinseki, 587 F.3d 1106 (Fed. Cir. 2009). 


ORDER

A 50 percent disability rating for PTSD for the entire appeal period prior to December 13, 2013 is granted, subject to the laws and regulations governing the payment of monetary benefits.

A disability rating in excess of 50 percent for PTSD is denied. 



______________________________________________
K. PARAKKAL
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs